IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

**TONY HOPPS**,

     Plaintiff,

v.

**CITY OF TAMPA, DETECTIVE GENE STRICKLAND, DETECTIVE J.D. O'NOLAN, DETECTIVE GEORGE MCNAMARA, AND AS-OF-YET UNKNOWN EMPLOYEES OF THE CITY OF TAMPA,**

     Defendants.

## COMPLAINT & DEMAND FOR A JURY TRIAL

Now Comes, Plaintiff TONY HOPPS, by and through his attorneys, LOEVY & LOEVY and the HUMAN RIGHTS DEFENSE CENTER, and complaining of the CITY OF TAMPA, DETECTIVE GENE STRICKLAND, DETECTIVE J.D. O'NOLAN, DETECTIVE GEORGE MCNAMARA, and AS-OF-YET UNKNOWN EMPLOYEES OF THE CITY OF TAMPA alleges as follows:

### Introduction

1. Plaintiff Tony Hopps was convicted of the burglary and robbery of Ruby and Dunbar Dyches ("Dyches robbery"), a crime he had nothing to do with.

2.      Plaintiff spent more than three decades in prison before his conviction was vacated and the charges were dismissed.

3.      Plaintiff had nothing to do with the crime and he has always maintained his innocence.

4.      The only evidence implicating Plaintiff was the false and fabricated identification of him by the Dycheses—an identification that the Defendants procured by using an unduly suggestive and highly improper photographic identification procedure.

5.      The problems with that procedure are so overwhelming as to violate the United States Constitution. The victims were told that the suspect was in the array; rather than administer the array themselves or ask a local law enforcement agency to do it, the Defendants mailed the victims the array without any meaningful cautionary instructions; the array consisted of people that had no legitimate connection to the Dyches robbery, but instead were all people who the Defendants believed would make convenient suspects in a crime of this type; and the Defendants intentionally used an old photograph of Plaintiff because they knew that if they used a current one, the Dyches would not select him.

6.      Indeed, Plaintiff looked nothing like the suspect that the Dycheses described. One of the most salient features of the perpetrator that the Dycheses could remember was that he had no beard. Plaintiff, by contrast, had a beard. And

the Defendants knew it: The Defendants stopped Plaintiff on the other side of town just minutes after the robbery and took a photograph of him. In that photograph, Plaintiff has a full beard.

7.     That was just the tip of the iceberg. The Defendants had ample evidence that Plaintiff could not have committed this crime, and was absolutely innocent. But instead of conducting a legitimate investigation into the crime, the Defendants short-circuited the investigation and framed an innocent man.

8.     It would take decades to undo that misconduct. In 2021, the Thirteenth Judicial Circuit State's Attorney's Office found that Plaintiff's conviction could not stand, in part, because of the unduly suggestive photo array and because of substantial evidence of Plaintiff's alibi and attendant innocence.

9.     Plaintiff, now a free man for the first time since 1990, brings this suit to vindicate the deprivations of his constitutional rights that caused him to spend more than three decades in prison for a crime that he did not commit.

**Jurisdiction and Venue**

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' tortious conduct and their deprivations of Plaintiff's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

12.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

**The Parties**

13.     Plaintiff Tony Hopps spent 31 years incarcerated for a crime he did not commit.

14.     At all times relevant to the events described in this Complaint, Defendants Gene Strickland, J.D. O'Nolan, and George McNamara were detectives in the Tampa Police Department. For purposes of this Complaint, Strickland, O'Nolan, and McNamara are collectively referred to as "Defendant Officers."

15.     Defendant City of Tampa is a municipal corporation that is or was the employer of Defendants Strickland, O'Nolan, and McNamara. Each of the Defendants named in this Complaint acted during their investigation of the Dyches robbery as agents or employees of the City of Tampa. The City of Tampa is responsible for the policies and practices of the Tampa Police Department, and is liable for the violations of Plaintiff's rights caused by the unconstitutional policies and customs of the Tampa Police Department, including actions of the above-named Defendants employed by the City of Tampa undertaken pursuant to those policies and customs during the Dyches robbery investigation.

16.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

### The Robbery

17.     On January 25, 1990, Ruby and Dunbar Dyches returned to their hotel room in Tampa, Florida.

18.     Approximately 10 to 15 minutes later, at around 3:15 p.m., two Black men robbed the Dycheses at gunpoint. The robbery was very brief, and the Dycheses had extremely limited opportunities to view the two perpetrators, making a legitimate identification impossible.

19.     As soon as Mr. Dyches opened the door, one of the perpetrators pressed a gun to Mr. Dyches's stomach. The gun captured Mr. Dyches's full attention, and he did not get a good look at the perpetrator's face.

20.     The second perpetrator then hit Mr. Dyches over the head with a hard object, and Mr. Dyches fell to the ground and lost sight of the perpetrators.

21.     The two perpetrators fled with Mrs. Dyches's purse in a maroon car.

### Plaintiff's Innocence

22.     Plaintiff is absolutely innocent of this crime.

23.     At the time of the robbery, Plaintiff was outside his home with his neighbor who was waiting to pick her nephew up at the bus stop.

24.     Shortly thereafter, on or about 3:49 p.m. on January 25, 1990, Plaintiff was detained outside his home by Officer Mark Scott about an unrelated investigation. At that time, Plaintiff also spoke to Defendant Strickland, who took a photograph of Plaintiff. In that photograph, Plaintiff has a beard.

### The Police Investigation

25.     The Defendant Officers began their investigation into the Dyches robbery.

26.     Unfortunately, the Dycheses could provide little to no information about the two suspects given their very limited opportunity to view them. To that end, neither Mrs. nor Mr. Dyches got a look at the second male who was involved in the robbery, and could not describe him.

27.     As for the first suspect, both Mr. and Mrs. Dyches described him as having a mustache but no beard, and being very muscular. Mr. Dyches thought that the suspect was between 5'8" and 5'10" tall, while Mrs. Dyches thought the suspect was much shorter—between 5'4" and 5'5" tall. Apart from the clothing that the suspect was wearing—camouflage pants with a cap—the Dyches could provide the Defendant Officers with no further information.

28.     Plaintiff did not match the description that the Dycheses gave. At the time of the robbery, Plaintiff had a beard and was not muscular. Additionally, when Plaintiff was detained by Defendant Strickland shortly after the robbery, he was not wearing camouflage pants or a hat.

29.     On January 26, 1990, the police apprehended a stolen vehicle, inside of which were Mrs. Dyches's stolen belongings along with guns, three masks, an L.A. Raiders cap, and a glove. Four men were seen running from the scene where the vehicle was apprehended, none of whom were Plaintiff.

30.     Plaintiff was not in the stolen car and the Defendant Officers knew it: They had arrested him on an unrelated case and he was in jail at the time the stolen vehicle was apprehended.

31.     Meanwhile, Defendant McNamara had a history with Plaintiff. Defendant McNamara had asked Plaintiff to help him locate a suspect in a different crime, and when Plaintiff refused, Defendant McNamara decided to pin the Dyches robbery on Plaintiff.

32.     Defendant McNamara knew Plaintiff could not have committed the Dyches robbery, but set out to ensure that Plaintiff could be implicated.

**The Unduly Suggestive Array and Fabricated Identifications of Plaintiff**

33.      Notwithstanding the Defendant Officers' knowledge of Plaintiff's innocence—he did not match the victims' description; he was speaking with police

across town shortly after the robbery; and he was in custody at the time the police apprehended the car with Mrs. Dyches's stolen belongings—the Defendant Officers put him in a photo array for the victims to view. That array was compiled sometime in February 1990.

34.    This photo array was highly improper.

35.    To start, the Defendant Officers placed six persons in the array based solely on the fact that they either had been arrested or were suspects in *other* robberies. There was no legitimate evidence that they were suspects in the Dyches robbery. The Defendant Officers knew that this was improper.

36.    Further, to the extent that any of the persons in the photo array were suspects, it was highly improper to put multiple suspects in a single array—and the Defendant Officers knew this.

37.    The actions described in paragraph 35 were consistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

38.    Pleading in the alternative, the actions described in paragraph 35 were inconsistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

39.    Additionally, on information and belief, the Defendant Officers used an old picture of Plaintiff in which he had no beard for the photo array. On information and belief, the Defendant Officers used this outdated picture because

they knew that if they used the picture that Detective Strickland took of Plaintiff just minutes after the robbery—in which Plaintiff had a beard—the Dycheses would not pick Plaintiff from the array.

40.    The Dycheses lived in Georgia. Rather than administering the photo array to the Dycheses themselves or asking a local law enforcement agency to administer the array to the Dycheses in person, the Defendant Officers simply mailed the array to the Dycheses.

41.    The actions described in paragraph 40 were consistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

42.    Pleading in the alternative, the actions described in paragraph 40 were inconsistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

43.    Defendant O'Nolan spoke with the Dycheses before he mailed the array. Defendant O'Nolan told the Dycheses that the suspect was in the array.

44.    The actions described in paragraph 43 were consistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

45.    Pleading in the alternative, the actions described in paragraph 43 were inconsistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

46.     In addition, Defendant O'Nolan included a letter to the Dycheses with the photo array. That letter was never disclosed to the prosecutor or the defense notwithstanding its obvious importance to the case and likely exculpatory and/or impeaching value.

47.     According to the Dycheses, they were permitted to open the letter and photo array together. Having not been instructed by Defendant O'Nolan or any Defendant not to do so, the Dycheses admitted that they discussed who they picked with each other—which is also improper.

48.     The actions described in paragraph 47 were consistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

49.     Pleading in the alternative, the actions described in paragraph 47 were inconsistent with the policies and practices of the City of Tampa and/or the Tampa Police Department.

50.     The Dycheses both selected Plaintiff even though he was absolutely innocent of the crime and looked nothing like the description the Dycheses gave to the Defendant Officers.

51.     The Dycheses returned the array in the mail with a letter. On information and belief, that letter was never disclosed to the prosecutor or the defense notwithstanding its obvious importance to the case. Also on information

and belief, this letter contained information that was exculpatory and/or impeaching.

52.     Defendants Strickland and O'Nolan interviewed Plaintiff and Plaintiff denied any involvement in the robbery.

53.     Based solely on the Dycheses' fabricated identifications of Plaintiff, in late February 1990, Plaintiff was arrested and prosecuted for their robbery.

### Plaintiff's Wrongful Conviction

54.     At trial, Ruby and Dunbar Dyches repeated their false and fabricated identification of Plaintiff.

55.     Plaintiff called Defendant Strickland to confirm that he could not have committed the crime because he was across town speaking with him shortly thereafter. Defendant Strickland testified falsely that he did not know the date and time that he detained Plaintiff on January 25 even though the dispatch records, which he possessed, demonstrated when Defendant Strickland spoke to Plaintiff and took his picture.

56.     On June 26, 1990, Plaintiff was convicted of burglary of a dwelling with a firearm and robbery with a firearm in connection with the Dyches robbery. He was subsequently sentenced to concurrent life sentences.

### Plaintiff's Exoneration and Damages

57.     Plaintiff never gave up on proving his innocence.

58.     At his request, the Conviction Review Unit ("CRU") of the Thirteenth

Judicial Circuit State's Attorney's Office undertook an extensive review and

reinvestigation of Plaintiff's case. The CRU made several key findings following

that reinvestigation, including that (a) the photo array was improper given the

manner in which it was administered; (b) Plaintiff did not match the description of

the offender that the Dycheses gave to the Defendant Officers; and (c) Plaintiff

could not have committed the robbery given the fact that he was at his home and

subsequently detained by Defendant Strickland around the same time as the

robbery.

59.     The CRU declared that the State could no longer stand behind the

conviction of Plaintiff.

60.     Plaintiff subsequently filed a motion for post-conviction relief, which

was granted by the court. After spending more than three decades in prison for a

crime that he did not commit, Plaintiff's conviction was overturned and the State

dismissed the charges against him.

61.     Although Plaintiff is finally free of the false and fabricated charges

against him, the damages from his wrongful conviction are substantial. During his

wrongful incarceration, Plaintiff suffered significant physical and emotional pain

and suffering. Plaintiff missed out on the opportunity to be with his family, and

live life as an autonomous and free human being. He was incarcerated in violent

and unpredictable prisons where he had to constantly remain on high alert to survive.

## Count 1
## 42 U.S.C. § 1983 – Due Process
## (Fourteenth Amendment)

62.     As set forth in paragraphs 25-61 above, Defendants Strickland, O'Nolan and McNamara, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

63.     In the manner described more fully above, the Defendants conducted unduly suggestive identification procedures, which resulted in fabricated and solicited false evidence, including the Dycheses' identification of Plaintiff, obtained charges against Plaintiff, secured his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal case.

64.     The Defendants also deliberately withheld exculpatory evidence from prosecutors and Plaintiff, and Plaintiff's criminal defense attorneys, including but not limited to the manner in which they induced the Dycheses into falsely identifying Plaintiff and the communications between Defendant O'Nolan and the Dycheses relating to the photo array.

65.     In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff, and that is materially exculpatory and/or impeaching.

66.     The Defendants' misconduct described in this count resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of his liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have, and would not have, been pursued.

67.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Plaintiff's innocence.

68.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 60 and 61 above.

69.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in Count 5.

**Count 2**
**42 U.S.C. § 1983 – Illegal Detention and Prosecution**
**(Fourth and Fourteenth Amendments)**

70.     As set forth in paragraphs 25-61, Defendants Strickland, O'Nolan and McNamara, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

71.     In so doing, the Defendants caused Plaintiff to be deprived of his liberty without probable cause, detained without probable cause, and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

72.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Plaintiff's innocence.

73.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 60 and 61.

74.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

## Count 3
## 42 U.S.C. § 1983 – Failure to Intervene

75.     As set forth in paragraphs 25-63, Defendants Strickland, O'Nolan and McNamara, during the constitutional violations described in this Complaint, stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

76.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Plaintiff's innocence.

77.     As a result of the Defendants' failure to intervene to prevent the violations of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in paragraphs 60 and 61.

78.     The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

**Count 4**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

79.     As set forth in paragraphs 25-61, Defendants Strickland, O'Nolan, and McNamara, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for the Dyches robbery, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

80.     In so doing, the Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

81.     In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

82.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

83.     As a result of the Defendants' agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above in paragraphs 60 and 61.

84.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Plaintiff's innocence.

85.   The misconduct described in this count was undertaken pursuant to the policies and practices of the City of Tampa, in the manner more fully described below in count 5.

**Count 5**
**42 U.S.C. § 1983 – Policy & Custom Claims Against the City of Tampa**

86.   Plaintiff's wrongful conviction was the result of the policies, practices and inadequate training of the City of Tampa.

87.   The City of Tampa employed individual Defendants Strickland, O'Nolan and McNamara, supervised them, and promulgated policies (including both written policies and unwritten customs) that caused the wrongful conviction of Plaintiff.

88.   Plaintiff's injuries described in this Complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the City of Tampa, as well as by the actions of policy-making officials for the City of Tampa.

89.   At all times relevant to the events described in the Complaint and for a period time before and after, the City of Tampa either had inadequate rules, regulations, policies, procedural safeguards, or failed to promulgate adequate rules, regulations, policies, procedural safeguards governing: the collection, documentation, preservation, testing, and disclosure of material exculpatory evidence and impeachment evidence; the conduct of identification procedures,

including photo arrays; the writing of police reports, taking of investigative notes and preservation of evidence, including documentary evidence; and the maintenance of investigative files and the disclosure of files in criminal proceedings.

90.    Officers and agents of the City of Tampa failed to promulgate proper or adequate rules, regulations, policies, and procedures notwithstanding the obvious need for such rules, regulations, policies, and procedures.

91.    In addition, or alternatively, the City of Tampa failed to properly train and supervise officers and agents of the Tampa Police Department with respect to the use of photo arrays during criminal investigations.

92.    For example, on information and belief, the City of Tampa failed to provide its officers with any training on how to conduct non-suggestive photographic identifications. The need for this type of training, however, was obvious.

93.    Mistaken eyewitness identifications are the leading cause of wrongful convictions.

94.    For example, as of January 1, 2023, eyewitness misidentification was a factor in 71% of the 2,658 exonerations in the United States. Stated differently, in more than half of the wrongful convictions, there was an erroneous identification of the suspect.

95.     There are a number of causes that lead to mistaken identifications—most notably, improper and unduly suggestive identification procedures.

96.     As early as 1968, the Supreme Court warned that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. . . . This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383-84 (1968).

97.     As a result, the need to train police officers on how to conduct photographic arrays was patently obvious. Unlike lawyers or social scientists, police officers do not come to the job with the knowledge of how to conduct identification procedures. Because police officers do not come to their jobs trained in the law or in science, a municipality's failure to train them on how to conduct identification procedures has the obvious consequence of leading to constitutional violations. That is particularly so because there is a strong likelihood that police will be confronted with situations where they have to administer an identification

procedure given the role of eyewitness identifications in the criminal justice system.

98.    In addition, on information and belief, the City had notice of the need for proper training and policies because of prior instances of misconduct. The City also had notice through supervision of its officers, and successful motions, and reported and unreported cases.

99.    The City also failed to provide its officers with training on *Brady v. Maryland*, 373 U.S. 83 (1963) and officers' attendant obligations to disclose material exculpatory and/or impeachment evidence. One former detective testified that he did not even know what exculpatory evidence was while another testified that he was not trained to disclose evidence or information to the prosecutor.

100.   Indeed, former Chief of Police Robert Smith testified that he did not recall there being any training on *Brady* during his tenure.

101.   Like photographic arrays, the need to train police officers on *Brady* was obvious. "[A]s *Connick v. Thompson*, 563 U.S. 51 (2011) suggests and as the weight of authority confirms, a city's 'wholly fail[ing]' to train police officers about the constitutional requirement to maintain exculpatory evidence would 'obviously' result in constitutional violations and thus charges the city with notice, even in the absence of a pattern of similar violations." *DuBoise v. City of Tampa*, No. 8:21-CV-2328-SDM-CPT, 2022 WL 4761097, at *2 (M.D. Fla. Oct. 3, 2022)

102.   Similarly, detectives were not required to memorialize certain information about a police investigation or keep documents in the official file maintained by the Records Division, which also led to the withholding of evidence.

103.   On information and belief, in a criminal investigation there were often two files: an official file maintained by the Records Division and a "working file" that the detective kept for his or her use.

104.   The official file maintained by the Records Division and the working file were not the same. For example, notes or other communications were not kept in the office file. Instead, if notes or communications were retained at all, they would be kept in the working file.

105.   One detective testified that he has never disclosed notes to the prosecutor in any of his criminal cases.

106.   Only documents in the official file kept by the Records Division were disclosed to the prosecutor.

107.   There was no policy that even required detectives to retain their working file or the documents in it.

108.   In short, given the foregoing, at all times relevant to the events described in this Complaint and for a period of time before and after, the City of Tampa had notice of practices and customs of officers and agents of the Tampa Police Department that included one or more of the following: (1) officers

conducted improper photo arrays and other identification procedures; (2) officers failed to properly document their investigation, including in written reports and by preserving evidence; and, (3) officers failed to disclose exculpatory and/or impeachment evidence during criminal trials.

109.   These practices and customs, individually and/or together, flourished because the leaders, supervisors, and policymakers of the City of Tampa directly encouraged, and were thereby the moving force behind, the very type of misconduct at issue by failing to (1) adequately train, supervise, and control their officers, agents, and employees on proper investigative techniques; and (2) adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

110.   The above practices and customs, so well settled as to constitute de facto policies of the City of Tampa, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

111.   Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the City of Tampa, including but not limited to the Defendants, who acted pursuant to one or more of the policies, procedures, and customs set forth above in engage in the misconduct described in this Complaint.

WHEREFORE, Plaintiff TONY HOPPS respectfully requests that this Court enter a judgment in his favor and against Defendants City of Tampa, Gene Strickland, J.D. O'Nolan, George McNamara, and as-of-yet unknown employees of the City of Tampa; awarding compensatory damages, attorneys' fees, and costs against each Defendant; awarding punitive damages against each of the individual Defendants; and any other relief that this Court deems just and appropriate.

## Demand for a Jury Trial

Plaintiff TONY HOPPS hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

Tony Hopps

By:  /s/_____
     *One of Hopps's Attorneys*


Jon Loevy*                          Paul Wright
Gayle Horn*                         Jonathan P. Picard
Heather Lewis Donnell*              Human Rights Defense Center
Rachel Brady*                       P.O. Box 1151
LOEVY & LOEVY                       Lake Worth, FL 33460
311 N. Aberdeen St.                 (561) 360-2523
Chicago, IL 60607
(312) 243-5900

*pro hac vice applications forthcoming